WILLIAM NELSON, JR., Appellant, *v.* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Respondent.

In order to establish fraud in the making of a contract with a city it is not essential to show precisely how or when the fraud was concocted or what particular city officials were implicated.

City officials cannot bind the municipality, either by making or by ratifying a fraudulent contract.

In an action to recover a balance claimed to be due upon a contract for furnishing drain and sewer pipe and invert blocks to the city of New York, the following facts appeared: The advertisement for proposals

specified forty-three different kinds of pipe required, with the estimated quantity of each; the right was reserved to the commissioner of public works to increase or diminish the gross quantity or the quantity of each kind "to an amount not exceeding thirty per cent of the gross amount of the contract." The contractor was to commence the delivery of the pipe and appurtenances at such time and in such manner and proportion as should be designated in the contract and complete the same within ninety days next thereafter. There were two bidders for the contract, plaintiff and McM. The prices bid by plaintiff on twenty-three of the different kinds of pipe were much below, and for the balance, much above the prices of McM. Plaintiff's bid as a whole, taking the estimated quantities, was lower than McM.'s,. and the contract was awarded to him. Of the twenty-six kinds for which the plaintiff's bid was the lowest, none were required or furnished. The quantities called for of nearly all the other kinds were largely increased, and the aggregate price of the materials furnished was far greater than under the bid of McM. The number of the invert blocks called for by the advertisement was two thousand. Plaintiff's bid was $3.50 apiece; he was offering to sell them in other places for $2.34. McM.'s bid for them was sixty cents. The number required and actually delivered was over twenty thousand. Proposals for the construction of sewers requiring over eleven thousand blocks were advertised and contracts for them let at the same time as the contract in question. For the first payment to plaintiff on the contract the city officials gave him an estimate largely exceeding the quantity of materials delivered and the time for delivering the materials was greatly extended. Plaintiff was not sworn as a witness on the trial and offered no evidence to explain the overestimate. *Held*, that the evidence justified a finding of fraud and collusion; that the contract was not in any proper sense let to the lowest bidder and imposed no obligation upon the city; also that the acceptance of the materials delivered under the contract was not a waiver of the fraud or ratification of the contract; also *held*, as it appeared that plaintiff had been paid more than a fair value for the materials delivered, he was not entitled to recover any further sum on the ground that the city had had the benefit of such materials.

Upon the trial defendant called two of the plaintiff's employes, who had charge of the deliveries of the materials; as witnesses, to show that when plaintiff received his first payment he had not furnished all the materials certified to. They testified that they kept a record of the deliveries in books and made entries at the time of each delivery; that these entries were correct and they had no independent memory of the items. *Held*, that so much of the books as related to deliveries to the city were properly received in evidence.

Also *held*, that statements made up from these books by one of the witnesses who had made most of the entries, showing the quantities of

materials delivered as appeared from them, and also showing the quantities in the bill of plaintiff claimed to have been overestimated, were properly received in evidence.

An audit of a claim against said city by the board of audit created by the act of 1872 (Chap. 9, Laws of 1872) has not the conclusive effect of a judgment, and while when the board is not fraudulently imposed upon and acts within its jurisdiction, its decision is conclusive upon the claim presented as to the liability of the city, and, until in some way reversed, cannot be collaterally attacked, it does not estop the city from setting up fraud as a defense to other claims arising out of the same contract.

· (Argued December 23, 1891; decided January 20, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made May 15, 1889, which affirmed a judgment in favor of defendant entered upon a verdict and affirmed an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Louis Marshall* for appellant. The validity of the contract upon which the plaintiff claims, was established by the decision of this court on the former appeal. (63 N. Y. 536; *Brown* v. *Mayor, etc.,* Id. 244; Story on Agency, § 250; *Hoyt* v. *Thompson,* 19 N. Y. 219; *Hasbrouck* v. *Milwaukee,* 2 Wis. 217.) The defendant having, with full knowledge of the facts, accepted the actual deliveries made by the plaintiff of the goods as varied under the reserved power in the contract, as a fulfillment of the contract, and, having paid in part therefor, could not, after such payment and acceptance, disaffirm the contract on the ground of fraud, based upon the existence of such reserved power, and the facts relating to the exercise thereof. (*In re Merriam,* 84 N. Y. 607; *Baird* v. *Mayor, etc.,* 96 id. 567, 584; Story on Agency, § 244; *Delafield* v. *State of Illinois,* 26 Wend. 226; *Moss* v. *R. L. M. Co.,* 5 Hill, 137; *Johnson* v. *Jones,* 4 Barb. 369; *Culver* v. *Ashley,* 19 Pick. 300; *Wheaton* v. *Baker,* 14 Barb. 594; *Bruce* v. *Davenport,* 3 Keyes, 474; *People* v. *Stephens,* 71 N. Y. 529, 557–559; *Proudport* v. *Montefiore,* L. R. [2 Q. B.] 511;

*Sweetman* v. *Prince*, 26 N. Y. 232; *Reed* v. *Randall*, 29 id. 358; *Gurrey* v. *A. & G. W. R. R. Co.*, 58 id. 364; *Vernol* v. *Vernol*, 63 id. 45; *Masson* v. *Boret*, 1 Den. 73; *Cobb* v. *Hatfield*, 46 N. Y. 536.) The determination of the board of apportionment and audit was an adjudication of the plaintiff's right to recover in this action, and, being unreversed, could not be attacked collaterally. It was, therefore, error in the court to direct the jury not to take into consideration such determination. (Laws of 1812, chaps. 9, 29, 375; 52 N. Y. 224; *People ex rel.* v. *Green*, 56 id. 679; *People ex rel.* v. *Barnes*, 114 id. 323; *M. G. Co.* v. *Mayor, etc.*, 9 Hun, 706; *Guidet* v. *Mayor, etc.*, 12 id. 566; *People ex rel.* v. *Green*, 64 Barb. 162; 1 Herman on Est. [2d ed.] §§ 435, 443; *Osterhoudt* v. *Rigney*, 98 N. Y. 222; *Van Wormer* v. *Mayor, etc.*, 15 Wend. 262; *White* v. *Coatsworth*, 6 N. Y. 137; *Suprs., etc.*, v. *Birdsall*, 4 Wend. 453; *People* v. *Suprs., etc.*, 35 Barb. 408; *People* v. *Stocking*, 50 id. 573; *Suprs.* v. *Briggs*, 2 Den. 26; *Huff* v. *Knapp*, 5 N. Y. 97; *Martin* v. *Suprs., etc.*, 29 id. 645, 647; *Boots* v. *Washburn*, 79 id. 207; *Pray* v. *Hegeman*, 98 id. 351; *Davis* v. *Talcott*, 12 id. 184; *Clemens* v. *Clemens*, 37 id. 59; *Gates* v. *Preston*, 41 id. 113; *Blair* v. *Bartlett*, 75 id. 150; *Tuska* v. *O'Brien*, 68 id. 446; *Dunham* v. *Brown*, 77 id. 76; *Smith* v. *Smith*, 79 id. 634; *Haskins* v. *Mayor, etc.*, 11 Hun, 436; *Beloit* v. *Morgan*, 7 Wall. 619; *Newton* v. *Hook*, 48 N. Y. 676; *Edgell* v. *Sigerson*, 26 Mo. 583; *B. R. S. Bank* v. *Edwards*, 10 Gray, 387; *Kane* v. *Fisher*, 4 Watts, 246; *Perkins* v. *Perkins*, 16 Mich. 162; *Trescott* v. *Barnes*, 51 Iowa, 409; *People* v. *Brisbin*, 80 Ill. 423; *Guest* v. *City of Brooklyn*, 79 N. Y. 624; *Lorillard* v. *Clyde*, 99 id. 196; *Flora* v. *Corbean*, 38 id. 111; Code Civ. Pro. § 829; *Astor* v. *Mayor, etc.*, 62 N. Y. 587.) Neither the pleadings nor the proofs warranted the court in setting aside the award of the board of apportionment and audit in this action on the ground of fraud, especially since it was not pretended that any fraud was committed either by the board or by the plaintiff in procuring the award. (*Mayor, etc.*, v. *Brady*, 115 N. Y. 599; *U. S.* v. *Throckmorton*, 98 U.

S. 68; *Smith* v. *Nelson*, 62 N. Y. 288; *Hendrickson* v. *Hinckley*, 17 How. [U. S.] 443; *Ross* v. *Wood*, 17 N. Y. 10; *Stilwell* v. *Carpenter*, 59 id. 423; *Ward* v. *Town of South-field*, 102 id. 287; *Reilly* v. *Mayor, etc.*, 111 id. 478; *In re Anderson*, 109 id. 554; *Baird* v. *Mayor, etc.*, 96 id. 592; *Shultz* v. *Hoagland*, 85 id. 467.)

*D. J. Dean* for respondent.     The contract put in evidence by the plaintiff, and under which he claims, was not authorized by law.     (63 N. Y. 558; Laws of 1872, chap. 872, § 8; *Green* v. *Mayor, etc.*, 60 N. Y. 303; Laws of 1857, chap. 446, § 38; *Wells* v. *Burnham*, 20 Wis. 112; *Leland* v. *Furlong*, Id. 437; *Houghton* v. *Burnham*, 22 id. 301; *Bigler* v. *Mayor, etc.*, 5 Abb. [N. C.] 51; *In 're Anderson*, 109 N. Y. 554; *In re Livingston*, 121 id. 94; *In re L. & W. O. Home*, 92 id. 116.)     The plaintiff cannot recover for materials actually delivered upon an implied contract.     (*McDonald* v. *Mayor, etc.*, 68 N. Y. 83; *Nelson* v. *Mayor, etc.*, 63 id. 535; *Lyddy* v. *Long Island City*, 104 id. 218; *Hawkins* v. *U. S.*, 96 U. S. 689.)     The exception taken by the plaintiff to the decision of the judge at Circuit, denying his motion for a new trial on the minutes, is unsound.     (Code Civ. Pro. § 999; *Joannes* v. *Jennings*, 6 T. & C. 138; *Hinman* v. *Stillwell*, 34 Hun, 180; *Winchell* v. *Latham*, 6 Cow. 682; *Culver* v. *Avery*, 7 Wend. 384; *Cheney* v. *N. Y. C. & H. R. R. R. Co.*, 16 Hun, 415; *Morss* v. *Sherrill*, 63 Barb. 21; *Colt* v. *S. A. R. R. Co.*, 1 J. & S. 189; 49 N. Y. 671; *Bogue* v. *Newcomb*, 1 T. & C. 251; 58 N. Y. 674; *Ins. Co.* v. *Gardner*, 7 J. & S. 543; *West* v. *F. N. Bank*, 20 Hun, 408; *Gray* v. *D., L. & W. R. R. Co.*, 16 J. & S. 121; *McIntyre* v. *Strong*, Id. 127; *Dollner* v. *Lintz*, 9 Daly, 17; *Gill* v. *Crosby*, 63 Ill. 190; 1 Thomp. on Trials, §§ 1037, 1039.)     The plaintiff's exceptions to testimony are unsound, and do not entitle him to a reversal.     (*Valton* v. *N. F. L. Ins. Co.*, 20 N. Y. 35; *Shaw* v. *Smith*, 3 Keyes, 316; *Moran* v. *N. Y. C. & H. R. R. R. Co.*, 67 Barb. 96; *Somerville* v. *Crook*, 9 Hun, 664; *Quimby* v. *Strauss*, 90 N. Y. 664; *Kelley* v. *People*, 55 id.

565 ; *Armsby* v. *People*, 2 T. & C. 157 ; *People* v. *McQuade*, 110 N. Y. 307 ; *People* v. *Kief*, 126 id. 662 ; *Spies* v. *People*, 122 Ill. 1 ; *People* v. *Buddensieck*, 103 N. Y. 582 ; *Mason* v. *Libbey*, 90 id. 686 ; *Kearney* v. *Mayor, etc.*, 9 id. 617 ; *Jordan* v. *Volkenning*, 72 id. 306 ; *Harrison* v. *Glover*, 72 id. 454 ; *Cliquot's Champagne*, 3 Wall. 143 ; *Fennerstein's Champagne*, Id. 147 ; *Lush* v. *Druse*, 4 Wend. 313 ; *Howard* v. *McDonough*, 77 N. Y. 592 ; *Richardson* v. *Hine*, 42 Conn. 206 ; *McCarney* v. *People*, 83 N. Y. 417 ; *Hoffman* v. *Conner*, 76 id. 124 ; *Murphy* v. *Broker*, 28 How. Pr. 263 ; *Chapman* v. *Brooks*, 31 N. Y. 88 ; *Cotton* v. *Haskins*, Litt. Sell. Cas. 151, 152 ; *Carr* v. *Mayor*, 11 J. & S. 158 ; *Place* v. *Minister*, 65 N. Y. 89 ; *State* v. *Ross*, 29 Mo. 32.) The plaintiff's exceptions to the judge's charge are unsound. (*Thalheimer* v. *Brinkerhoff*, 4 Wend. 394 ; *Luby* v. *H. R. R. R. Co.*, 17 N. Y. 131 ; 44 id. 22.) The proposition advanced by the appellant, that the action shown to have been taken by the board of audit is conclusive against the defense in this action, is unsound. (Laws of 1872, chap. 9, §§ 1, 2 ; *Brown* v. *Mayor, etc.*, 3 Hun, 685.) The facts of a former payment to the plaintiff of the sum of $55,327.69, and the alleged voluntary allowance thereof by the board of audit, were irrelevant to the issue in this case concerning the liability of the city of New York for a claim never presented to that board. (*People ex rel.* v. *Bd. Suprs.*, 1 Hill, 362.) The professed audit was void for fraud. (*Brennan* v. *Mayor, etc.*, 8 Daly, 426 ; *Mandeville* v. *Reynolds*, 68 N. Y. 543 ; *Wilson* v. *Barney*, 5 Hun, 257 ; Bigelow on Fraud, 86–88 ; *Ward* v. *Town of Southfield*, 102 N. Y. 287.) The jury have found that this contract was entered into in pursuance of a fraudulent conspiracy between the plaintiff and the commissioner of public works ; that finding is conclusive. (*Bd. of Suprs.* v. *Ellis*, 59 N. Y. 620 ; *Lyddy* v. *Long Island*, 104 id. 218 ; *People ex rel.* v. *Gleason*, 121 id. 635.)

EARL, Ch. J. This action was brought in October, 1873, to recover the balance claimed by the plaintiff to be due to him for vitrified salt glazed stoneware drain and sewer pipe and

invert blocks, delivered by him to the city in the years 1871 and 1872, under a contract with the city made in 1871. He has been paid seventy per cent of the contract price for the materials delivered, and the claim he now makes is for the remaining thirty per cent retained by the terms of the contract, to wit, the sum of $54,550.60 and the interest thereon from December 12, 1872.

The action has been twice tried. On the first trial the complaint was dismissed on the ground that the contract under which the plaintiff claimed was, under the circumstances appearing, not authorized by law. The judgment for the defendant was affirmed at the General Term (5 Hun, 190), but upon appeal to this court it was reversed. (63 N. Y. 535.) Upon the second trial no question was made that the contract was legal in form and was authorized by law. Nor was any question made that all the materials for which the plaintiff claimed payment had been delivered. The only defense made to his claim was that the contract under which the materials had been delivered was procured by him through fraud and collusion with some of the officers and agents of the city, and that, therefore, it was void and not binding upon the city. All the oral evidence upon the trial was introduced upon this defense, and no other matter was submitted to the jury. Upon the defense of fraud, the jury found a verdict in favor of the defendant, upon which judgment was entered. That judgment has been assailed by the learned counsel for the plaintiff with much elaboration and ability, and yet we do not think he has been successful in pointing out any error for which it should be reversed.

The evidence of fraud and collusion in the making and execution of the contract was sufficient to sustain the verdict. The department of public works advertised for proposals to furnish the pipes and invert blocks. The advertisement was first published on the 8th day of April, 1871, and by its terms the letting of the contract took place on the eighteenth day of the same month. The advertisement specified the size, quantity and quality of the materials to be furnished, and

among the specifications was the following: "The commis-sioner of public works reserves the right to increase or diminish the gross quantity, or the quantity of each kind, to an amount not exceeding thirty per cent of the gross amount of contract, but the time of delivery, however, to be extended or diminished in the ratio of the increase or diminution;" and this clause was embodied in the contract. If every bidder for the contract put fair, honest, *bona fide* prices upon each kind of pipe to be furnished, this clause could work no mischief or injustice. But it gave opportunity — just such opportunity as could be desired by a person who wished, in collusion with the officers of the department of public works, to put in what is called an unbalanced bid — to perpetrate a fraud upon the city. No one not in fraudulent complicity with the city officials could, with this clause in operation, safely put in an unbalanced bid. If he bid a very low price for some of the pipes and a very high price for others, the city officials might require him to furnish a large quantity of pipes which he had offered to fur-nish for much less than their value, and very little or none of those which he had offered to furnish for more than their value, and thus he might be financially ruined, unless his pecuniary resources were very great. But by increasing the quantity of pipes which the bidder had agreed to furnish for a price largely in excess of their value, the city officials could make the fortune of the bidder. It is thus clear that no man of prudence could, under such circumstances, dare to put in an unbalanced bid, and thus place his fortune at the mercy of the city officials. If this clause had simply permitted the city officials to increase or diminish any kind of pipe only thirty per cent, the facilities for fraud would not have been so great. But with rare cunning it was so framed that any one kind of pipe could be increased by thirty per cent of the gross amount of the whole contract, and thus an enormous increase of the kind of pipe most profitable to the contractor was made possible.

There was another clause in the proposals, harmless if hon-esty was the purpose in the making and performance of the

contract, but well calculated to favor a contractor who was in complicity with city officials, and that provided that the contractor should "commence the delivery of said pipe and appurtenances *at such time and in such manner and proportion* as shall be designated in said agreement hereunto annexed, and complete the same within ninety days next thereafter."

Thus the way was prepared, and the fraudulent scheme, as the jury must have found, was concocted.

Now, what happened? There were two bidders for the contract, Mr. McMann and the plaintiff. The prices bid by the plaintiff on many kinds of pipe were much below, and on many kinds much above, the prices of McMann, and the result was that for the estimated quantities of pipes and invert blocks contained in the proposals at the prices bid respectively by the two bidders, the plaintiff's bid was $55,454.50 lower than his competitor's, and the contract was, therefore, awarded to him. What further happened? In the advertised proposals there were forty-three different quantities and kinds of pipes mentioned, and for each of these the bidders named a price, and under the clause above quoted twenty-six of these kinds were entirely omitted, none having been required or furnished; and in every case where none was furnished, the bid of the plaintiff was lower than that of McMann; and in no case was there an entire omission of pipe where the price of the plaintiff was greater than that of McMann; and in the remaining seventeen kinds of pipe, where plaintiff's prices were higher than those of McMann, the quantities were, in all but four trifling exceptions, largely increased. The result was that, measuring by the prices bid, the aggregate contract price of the pipes and invert blocks delivered by the plaintiff under the contract was $70,947.03 more than the same materials would have cost if the contract had been awarded to McMann upon the prices bid by him. It is difficult to account for these remarkable results by any theory of chance or accident, and it is hard to disbelieve that they were not due to a fraudulent scheme previously devised.

There is another significant fact. The specifications as

advertised required two thousand invert blocks, and for these. the plaintiff bid $3.50 a piece, although he was at the time offering to sell them in different parts of the country for $2.60,. with at least ten per cent discount, and McMann's bid for them was only sixty cents a piece; and the quantity of these blocks required and actually delivered was 20,127, an increase of more than ten fold; and yet at the same time when the department of public works advertised for bids for the two. thousand invert blocks, it advertised for proposals to construct sewers which required over 11,000, and these sewer contracts were let at the same time as the contract for materials let to the plaintiff. This evidence tended to show that when the. city officials inserted in the specifications for the materials,. 2,000 invert blocks, they knew the city would need much more, and thus there was a fine opportunity for the operation of plaintiff's unbalanced bid.

This is not all. The evidence tends to show that for the first payment made to the plaintiff under his contract, the city officials gave him an estimate for a much larger quantity of materials delivered under his contract than he had actually delivered, and that thus he was enabled to obtain from the city several thousand dollars more than was at that time his. due. By the terms of the letting and of plaintiff's contract, he was required to deliver all the materials in about one hundred days, and yet he was permitted to take many days in excess of that number.

It cannot, we think, be said that all these facts are equally consistent with honesty as with fraud. They seem to point unmistakably to fraud and collusion. It does not seem possible that such a contract could be so made and executed with honest and fair motives. The plaintiff introduced no evidence. on the trial to parry or weaken the force of this evidence. He, knowing more of the facts than any other living witness,. did not even offer his own evidence to put an innocent face. upon facts which bear such an ugly aspect. Fraud need not. be proved by direct evidence. It is generally disguised and covered up and must be brought to light by the proof of cir-

cumstances not equally consistent with innocence. Here we cannot doubt that the evidence was sufficient to warrant the verdict of the jury. (*Matter of Anderson*, 109 N. Y. 554.)

It was not incumbent upon the defendant to show precisely how or when the fraud was concocted, or what particular city officials were implicated in it. It was enough to show that the contract with whomsoever made was the creature of fraud.

Thus this contract was not in any proper sense, as required by the law, let to the lowest bidder, and being fraudulent and void, it imposed no obligation upon the city.

But the plaintiff attempts to answer the charge of fraud in three ways : (1) He says that the city waived the fraud and ratified the contract by receiving the materials delivered under the contract, and thus accepting performance thereof. As matter of law the city did none of these things. It could only act through its agents, and they could bind it only when acting for it within the boundaries prescribed by law. As they could not bind it originally by such a fraudulent contract, they could not bind it by subsequently in any manner ratifying it. They could not bind it either by making or ratifying a fraudulent contract. The city officials, in fraudulent complicity with the plaintiff, certainly could not ratify the contract; and the acts of honest officials in recognition of the contract, while ignorant of the fraud, would not ratify it. And further, no city official like the comptroller, or even the mayor, could ratify the contract who did not have power to bind the city by such a contract; and no contract could be made binding by ratification which could not at the time of the ratification be made. The law required such contracts to be let after advertisement to the lowest bidder. The letting of this contract was merely a formal, not a real, compliance with the law, and it was so affected with fraud that the city did not become bound thereby. No officer of the city could thereafter make such a contract absolutely binding upon the city by ratification or otherwise, except in the form prescribed by law. But there is a further answer to this claim of ratification, and that is that no such claim appears

to have been made upon the trial, and the trial judge was not asked to rule upon such a claim or to charge the jury in reference thereto, and he did not submit and was not requested to submit the facts in reference thereto to the jury. The sole question of fact submitted to the jury was that of fraud, and the judge in substance charged the jury that if they found the alleged fraud and collusion in the origin of the contract, they must render their verdict for the defendant; but that if they found the contract was honestly made the plaintiff was entitled to recover; and to this there was no exception; and thus the plaintiff cannot now complain that the case was given to the jury upon an erroneous view of the law. (2) It is said that the city has had the benefit of these materials and, therefore, ought to pay for them. How much ought it to pay? Certainly not the contract prices placed upon them by the plaintiff in his unbalanced, fraudulent bid. If the plaintiff claims he should be paid their value, the answer is that he did not upon the trial put forward such a claim. There he claimed to recover upon his contract, and he gave no evidence whatever of the value of the materials, and he furnished no basis whatever for any recovery by him of the value. On the contrary, the evidence tended to show that he had already been paid more than a fair value for the materials delivered by him. He had received, at least, $15,000 more than the materials were fairly worth, if their value be measured by the prices named in the bid of McMann; and it further appears that he was probably paid nearly the full value of the materials delivered by him measuring their value by the prices for which he sold the same materials in the market to other purchasers. (3) He further says that the city has been deprived of the defense of fraud by the action of the board of audit, consisting of the comptroller, the commissioner of public works and the president of the department of public parks, created by the act, chapter 9, of the Laws of 1872. That board was authorized to audit claims against the city, and the plaintiff presented to them claims against the city amounting to the sum of $55,327.69, and they were audited and allowed

for that sum and subsequently paid by the city. The plaintiff claims that that sum was seventy per cent of three bills, amounting to $79,039.35 for materials furnished under this contract, and that the remaining thirty per cent, $23,711.66, remains unpaid, and is part of the sum sought to be recovered in this action. It does not appear what documents, papers or proof were before the board. It is inferable that the three bills were before them. It does not appear what determination or adjudication they made. All the plaintiff claimed was $55,327.69, and that sum they audited and allowed, and so far as we know they made no other determination. The counsel for the plaintiff claims that the audit must have the same effect as a judgment rendered by a court, and hence that the contract must be deemed to be valid and free from fraud, and that the city is thereby estopped from denying its liability for plaintiff's entire claim. It is undoubtedly true that if the plaintiff had sued the city for the three bills and had recovered the amount audited in an action, there would have been a conclusive adjudication of the validity of the entire claim. But can a mere audit by a board simply clothed with the power to audit have such conclusive effect? Our attention is called to no authority giving the audit such effect, and we are confident there is none. The law of 1872 provides for nothing akin to a regular judicial proceeding. It does not provide for the examination of witnesses and there is none of the ordinary machinery of a court of justice. To give to the audit of such a board the far reaching effect of a regular judgment would be both novel and mischievous. Such an audit when the auditors are not fraudulently imposed on and act within their jurisdiction, is undoubtedly conclusive until in some way reversed as to the liability of the city for the amount audited, and it cannot be collaterally overhauled or attacked. But it is conclusive for nothing more, and this is true of every audit made by county supervisors and town boards of auditors. When the auditors honestly allow a claim, acting within their jurisdiction, and no fraud has been practiced upon them in procuring the allowance the liability of the municipality is

fixed, and the claim is no longer subject to dispute. But the audit does nothing but fix the amount of the claim, simply that and nothing more. Then, too, the audit of this board may have proceeded upon the theory that there was at least the sum audited due the plaintiff for the materials delivered, and it cannot be known from this record that they meant to decide more, and they certainly had no authority to decide more, and the audit does not establish that the plaintiff is entitled to the amount claimed in this action, or even the sum of $23,711.66, the balance now claimed upon the three bills presented. So we think the trial judge did not err in his charge to the jury that they " had nothing to do with what the board of audit did."

As before stated, the defendant gave evidence tending to show that when the plaintiff received his first payment under his contract he had not furnished all the materials certified for him by the city officers, and hence that his payment was greater than he was then entitled to. The evidence on the part of the city upon this point was mainly that of two employes of the plaintiff who had charge of the deliveries of the materials to the city and who kept a record of the deliveries in books kept by them. They testified that the entries in the books were made at the time of the deliveries; that they were correct, and that they had no independent memory of the items, and thus foundation was laid for the introduction of the books. It is now claimed that the accuracy of the books was not sufficiently proved, and that it was error to receive them in evidence. They were objected to on the part of the plaintiff on the following grounds: " (1) That by the evidence of the defendant's own witness they are not the books of the plaintiff. (2) Because the books contain entries of other matters besides the deliveries to the city. (3) That the evidence is immaterial inasmuch as defendant's counsel has already admitted that the plaintiff has delivered to the defendant all the pipe for which he claims to recover." The trial judge overruled the objection and admitted so much of the books in evidence as related to deliveries to the city. No other

objections were made to the books at any stage of the trial, and clearly none of these were valid.

The defendant's counsel also put in evidence statements made up from these books by one of the witnesses who had made most of the entries in them, showing the quantities of materials delivered as appeared from them, which statements also showed the quantities of materials in the bill of the plaintiff which was claimed to be overestimated. These statements were intended to show by contrast that plaintiff's first bill was inaccurate and greatly exaggerated. They were objected to by plaintiff's counsel as incompetent, immaterial and irrelevant, and on no other ground. The counsel has made a most elaborate argument to show that it was error to receive these statements. It may be that when all the evidence is carefully analyzed they appear to be less weighty as evidence than claimed by the defendant, and probably they may be entitled to but little weight. But they were evidence for what they were worth. No defect in the proof relative to them was pointed out. Their accuracy seems to have been assumed. They had some tendency to sustain the allegation of the defendant that the first bill presented by the plaintiff under his contract was fraudulent, collusive or very carelessly and recklessly made. The judge submitted this evidence to the jury with some very pertinent and significant remarks, to which no exception was taken on the part of the plaintiff. No claim whatever was made that there was not sufficient evidence upon this point for submission to the jury. There was, therefore, no error in the reception of these books and statements, and there is now certainly no valid ground of complaint as to them on the part of the plaintiff.

No other exceptions require attention, and our conclusion is that the judgment should be affirmed.

All concur.

Judgment affirmed.